UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION - BAY CITY

IN RE:

      WILLIAM P. IRWIN,                        Case No. 08-20212-dob
                                              Chapter 12 Proceeding
          Debtor.                      Hon. Daniel S. Opperman
_____/

WILLIAM P. IRWIN,

         Plaintiff,

v.                                          Adversary Proceeding
                                            Case No. 08-2091-dob

FRANKENMUTH CREDIT UNION,

         Defendant.
_____/

<u>OPINION</u>

      Plaintiff, William P. Irwin, filed this action objecting to the secured claim of the Defendant and seeking a determination of the validity of that lien, as well as requesting compensatory and exemplary damages. Defendant, Frankenmuth Credit Union ("Credit Union"), objected to the relief requested by Mr. Irwin and denies that it owes him any money. The Credit Union filed a Motion for Summary Judgment that the Court heard on July 6, 2009. The Court dismissed Count I of Mr. Irwin's Complaint, but denied the Credit Union's summary judgment motion as to Counts II, III, and IV. The Credit Union renewed its Motion for Summary Judgment on July 17, 2009, and the Court denied the renewed motion. Trial commenced on July 17, 2009, and the proofs were closed that day. The parties subsequently filed post-hearing trial briefs outlining their positions in this action.

<u>Findings of Fact</u>

Mr. Irwin grows cash crops and provides custom combining services to area farmers. Early in his career, Mr. Irwin hired a consultant for advice regarding borrowing and compiling most of the information necessary to obtain loans from financial institutions. From this relationship, Mr. Irwin was trained on how to compile financial information and obtain loans from financial institutions such as the Credit Union. For many years prior to 2007, Mr. Irwin borrowed money from the Credit Union to acquire equipment and for annual operating costs. He typically repaid the operating loans extended to him by the Credit Union, which ranged anywhere from $50,000 to $75,000 per year. Mr. Irwin also made the necessary installment payments for various term loans extended by the Credit Union to him or his farming entities.[1]

In 2006, Mr. Irwin obtained two loans from the Credit Union. The first was a loan in the amount of $38,081.59, which matured and was payable in full on October 1, 2006. (Def.'s Ex. 2.) The second loan was to Mr. Irwin and Irwin Farms, LLC, in the amount of $37,500, which matured and was payable in full on September 1, 2006. (Def.'s Ex. 3.) Both of these loans were not paid in full on their maturity dates. The Credit Union, through its loan officer at the time, Kathleen Jurmanovich, began the requisite collection efforts on both of the delinquent loans. Mr. Irwin would report his efforts to repay the loans to Ms. Jurmanovich. In particular, Mr. Irwin tendered partial payments to the Credit Union from the sale of crops, income earned from custom harvesting, as well as the sale of equipment. By the winter of 2007, the first loan was paid in full and a remaining balance of approximately $21,000 existed on the second loan.

---

[1] For ease, the Court notes that Mr. Irwin conducted business as "Irwin Farms", along with his wife, Cynthia Irwin, and also is a member of Irwin Farms, LLC, a limited liability company. The reference to Mr. Irwin includes these various business entities. Likewise, the Frankenmuth Credit Union, is the successor entity to Town & Country Family Credit Union. Town & Country Family Credit Union was the credit union that extended the vast majority of the loans described in this Opinion.

By January, 2007, Mr. Irwin was experiencing difficulties in his agricultural business and his personal life due to his pending divorce from his wife, Cynthia Irwin.[2] Around this time, Mr. Irwin also had a combine and related equipment repossessed by Bader and Sons Company on behalf of John Deere Credit Corporation because of a missed installment payment. He met with Ms. Jurmanovich a number of times for the purpose of obtaining a loan to cover his operational costs for 2007. During their meetings, Ms. Jurmanovich repeatedly informed Mr. Irwin that a loan for his 2007 operating funds would not be available until the remaining balance on the second loan was paid.

Mr. Irwin reached out to Julian Pilarski, an area farmer who hired Mr. Irwin to do custom combining for him. In the past, Mr. Pilarski had advanced monies to Mr. Irwin. He was willing to do so again in 2007 to ensure that Mr. Irwin could complete the custom combine work on his crops. The amount requested by Mr. Irwin, which exceeded $20,000, caused Mr. Pilarski grave concern due to the large amount of the requested advance. As a result, Mr. Pilarski began inquiries with Ms. Jurmanovich to verify that the Credit Union would loan the necessary 2007 operating funds to Mr. Irwin if he provided the advance sought by Mr. Irwin. To that end, Ms. Jurmanovich sent Mr. Pilarski the following e-mail:

"Julian:

As per our conversation on the phone on 05-07-07, this e-mail is clarification that

---

[2] Mr. Irwin based a portion of his case on an unrelated business transaction between his wife and Ms. Jurmanovich. Ms. Jurmanovich attended a session hosted by Cynthia Irwin for the presentation, use, and sale of Mary Kay products. Unbeknownst to Mr. Irwin, Ms. Jurmanovich agreed to become a sales agent for Cynthia Irwin and purchased the necessary Mary Kay products from her. Ms. Jurmanovich was not successful in selling these products. Mr. Irwin claims that their relationship was such that Ms. Jurmanovich wanted to help Ms. Irwin and therefore acted to harm him by misleading him and Mr. Pilarski. Aside from the existence of this business transaction between Ms. Jurmanovich and Ms. Irwin along with a weak inference that this relationship caused her to act as she did, there is nothing in the record to support Mr. Irwin's theory in this regard.

Town & Country Family Credit Union will be able to give Bill Irwin of Irwin Farms operational money for 2007 as long as his current loan is paid in full before May 31, 2007."

(Def.'s Ex. 17.)  On May 16, 2007, Ms. Jurmanovich sent Mr. Pilarski a second e-mail, which stated:

"Julian:

With your money that you will advance to Bill Irwin, it would pay off his loan and we could start the process for another loan for operational."

(Def.'s Ex. 17.)

Mr. Pilarski testified that he received the May 7 e-mail, but was unaware of the May 16 e-mail because it was delivered to a "bulk bin" e-mail file that he did not know how to access without assistance from another person.  Mr. Pilarski stated that he relied upon the May 7 e-mail and issued a check made payable to William Irwin in the amount of $21,632.33 dated May 19, 2007.  (Def.'s Ex. 10.)  The check contained a notation that reads: "Adv. Pay. Cont. Acres".  From Mr. Pilarski's testimony, this note appears to indicate that he made an advanced payment on the combining contracts he had with Mr. Irwin.

Additionally, Mr. Irwin entered into contracts with Mr. Pilarski and other entities to deliver commodities in an effort to convince the Credit Union that there would be a sufficient income stream to service any loan advanced by it to him.  In particular, Mr. Irwin believed that he could possibly get a loan of up to $500,000 to continue operations.  He did not, however, receive any specific assurances from any member of the Credit Union's staff that such a loan would be made.  Instead, Mr. Irwin pieced this information together from various meetings he had with Ms. Jurmanovich, as well as his attendance at a meeting in which Credit Union personnel described the upcoming merger with Town & Country Family Credit Union.  Mr. Irwin does not claim that he received any written statement from the Credit Union indicating that a loan would be made by it to him beyond a $10,000 loan the Credit Union did extend to him.

Except for the $10,000 loan, neither party produced any evidence regarding the amount, length, interest rate, payment terms, or conditions and covenants customarily found in a commercial agricultural loan of this type and magnitude.

After receiving Mr. Irwin's payment for the outstanding balance on the second loan, Ms. Jurmanovich continued her efforts to finance Mr. Irwin's 2007 operations. She testified that the Credit Union had in its file for Mr. Irwin a 2004 appraisal from Sheridan & Sons Auction Service LLC that reported the appraised value of his farm equipment at $515,600. (Def.'s Ex. 4.) Ms. Jurmanovich testified that the Credit Union requested and received an updated appraisal from Wegner Auctioneers & Appraisers effective from March 1, 2007 to March 5, 2007 that reported an appraised value of Mr. Irwin's farm equipment at $195,100. (Def.'s Ex. 7.) She also requested an updated credit report, which was completely unsatisfactory to the Credit Union because Mr. Irwin was given a low "E grade". Armed with this information, Ms. Jurmanovich determined that a potential risk to the Credit Union existed if it lent significant monies to Mr. Irwin for his 2007 operations. The Credit Union denied Mr. Irwin's request to provide a loan to fund his 2007 operational costs. Instead, the Credit Union lent him $10,000.

Shortly afterward, John Deere Credit Corporation sold the combine and related equipment that Mr. Irwin had hoped to use for his custom combining work. When the combine and related equipment were repossessed, Mr. Irwin owed John Deere Credit Corporation over $37,000 and was past due for one installment payment of $17,000.

By August, 2007, it was clear to all the parties that the Credit Union would not provide a loan to Mr. Irwin to cover his operating costs for 2007. Mr. Pilarski, through counsel, began demanding payment of $21,632.33 from the Credit Union because he believed that it had improperly received this money. At this time as well, Mr. Irwin's divorce was finalized.

By December, 2007, the Credit Union decided that it should resolve its differences with

Mr. Pilarski and paid him $21,632.33 in exchange for a release and assignment of the rights that Mr. Pilarski had against Mr. Irwin. On December 28, 2007, the Credit Union entered the balance of $21,632.33 as an amount due and owing on the second loan the Credit Union made to Mr. Irwin in 2006.

Approximately one month later, on January 29, 2008, Mr. Irwin filed a Voluntary Petition seeking relief under Chapter 12 of the Bankruptcy Code. The Credit Union filed a Proof of Claim (No. 11) in the amount of $21,973.91 on May 15, 2008, claiming a secured interest in Mr. Irwin's farm equipment and machinery. It is this claim that is the subject of Mr. Irwin's Complaint.[3]

## Statement of Jurisdiction

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E.D. Mich. LR 83.50(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (K), and (O). The parties do not contest jurisdiction.

## Analysis

The Court dismissed Mr. Irwin's fraudulent misrepresentation claim prior to trial, leaving an objection to claim based upon innocent misrepresentation, as well as a claim for tortious interference with a contract or business expectancy. Mr. Irwin also seeks an award of exemplary damages.

A.    Tortious Interference with a Contract or Business Expectancy

A plaintiff must show that a defendant's actions are either intentionally per se wrongful

---

[3] The Credit Union has filed another claim in this case, but neither Mr. Irwin or the Trustee has objected to this claim. For purposes of this Opinion and corresponding Order, reference to the claim is to claim number eleven only.

or that an act is done with malice or without justification, all with the purpose of invading a contractual right or business relationship of another. *Formall Syntrac Systems, Inc. v. Community National Bank of Pontiac*, 166 Mich. App. 772, 779-80, 421 N.W.2d 289, 292-93 (Mich.Ct.App. 1988); *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 95-96, 443 N.W.2d 451, 462-62 (Mich.Ct.App. 1989). A defendant who acts with a legitimate business reason does not improperly interfere with a contract or business expectation. *Id.*

Mr. Irwin argues that the Credit Union improperly acted by requiring him to enter into contracts with Mr. Pilarski for custom combining and with other entities for the sale of commodities. Mr. Irwin testified that these contracts had a positive economic benefit for him because he would have the certainty of a future business relationship with Mr. Pilarski to provide custom combining, as well as earning income at certain points of the year as to the sale of commodities. In examining the Credit Union's actions, a requirement that a potential borrower enter into written contracts is certainly not a per se wrongful act or without justification. Instead, the actions of the Credit Union were justified and completely consistent with prudent financial institution procedures. The uncontroverted testimony of Ms. Jurmanovich indicates that the Credit Union sought to confirm that Mr. Irwin would have sufficient sources of income to repay a loan provided by it. Taken on its own, any requirement, expectation, or insinuation by the Credit Union that Mr. Irwin should enter into these contracts does not sustain his claim for a tortious interference with a contract or business expectancy.

Mr. Irwin also asserts that the actions of the Credit Union caused him to lose his combine and related farm equipment. He posits that had the Credit Union not sent the May 7, 2007, e-mail to Mr. Pilarski, he would have taken the approximate $21,000 that Mr. Pilarski advanced to him and paid John Deere Credit as opposed to the Credit Union. Instead, Mr. Irwin claims that by paying the $21,632.33 to the Credit Union, he thought that it would in turn advance sufficient

monies in the form of an operation loan to him to enable him to pay John Deere Credit and to allow him to keep his combine.

Mr. Irwin's case fails for a number of reasons. First, the record is clear that the combine and related equipment were repossessed prior to the May 7, 2007, e-mail from Ms. Jurmanovich to Mr. Pilarski. Second, the record is likewise devoid of any evidence that the Credit Union would have loaned sufficient monies to Mr. Irwin to enable him to pay John Deere Credit either in installments or in full. Third, there is no evidence that any hope for a 2007 operating loan would be allowed to be drawn upon to make a payment for an existing term loan for the purchase of equipment. Stated differently, the purpose of the operating loan for 2007 would be to finance usual and general operating expenses such as fuel, repairs, and wages. Mr. Irwin contends, unpersuasively, that the Credit Union would allow an operating loan to be used to finance a term loan. What appears to have really happened here is that by 2007 Mr. Irwin was unable to continue the financial shell game of moving money from one location to another. The Credit Union simply made a decision not to loan additional monies to Mr. Irwin after reviewing the recent farm equipment appraisal and the substandard credit report regarding his credit history.

Finally, Mr. Irwin urges that the relationship between Ms. Jurmanovich and his ex-wife, Cynthia Irwin, constituted a sufficient per se wrongful act to support his claim. At the various hearings on the Credit Union's summary judgment motions, the Court inquired about this relationship because facts could have been developed to indicate that Ms. Jurmanovich acted outside of her scope of employment with the Credit Union and in concert with Cynthia Irwin. After the conclusion of proofs, however, the Court finds that such is not the case. Instead, the record in this case overwhelmingly indicates that Ms. Jurmanovich attended a single session in which Mary Kay products were demonstrated by Cynthia Irwin. Being intrigued by these products, Ms. Jurmanovich thought she would try selling these products to others and entered

into a contract with Ms. Irwin to do so. She never sold any of the products. Instead, she either personally used the products or gave them away as gifts. There is nothing in the record that insinuates or infers that Ms. Jurmanovich spoke with Ms. Irwin about Mr. Irwin's hope for a loan. Likewise, there is nothing in the record to indicate that Ms. Jurmanovich acted improperly. In short, while a relationship between Ms. Jurmanovich and Ms. Irwin did exist, it is merely a red herring that does not rise to any conceivable per se wrongful act to support Mr. Irwin's claims.

Accordingly, the Court concludes that the Credit Union acted in its own financial best interests in its business relationship with Mr. Irwin. He has failed to show any type of requisite wrongful conduct or any action that is not justified under these circumstances. The Court grants judgment to the Credit Union on Count III of Mr. Irwin's Complaint.

B.     Innocent Misrepresentation

Mr. Irwin's Complaint focuses on the May 19, 2007, check from Mr. Pilarski to him in the amount of $21,632.33. This check was made payable to Mr. Irwin and was subsequently endorsed and tendered by him to the Credit Union to pay his second loan in full. (Def.'s Ex. 10.) On that date, the Credit Union received these monies and properly applied the check to reduce the balance owed to zero. Somewhat later, after Mr. Irwin realized that the Credit Union would not provide him with a loan for any of his 2007 operating costs, he was forced to inform Mr. Pilarski that he would not be able to do custom combining work for him. In turn, Mr. Pilarski felt misled and had his attorney write a series of demand letters to the Credit Union. (Def.'s Ex. 17 and 19). As a result of these letters, the Credit Union decided to settle any claims Mr. and Mrs. Pilarski had with it. In turn, the Credit Union received an assignment of claim and a release from them.

At the trial, Mr. Pilarski testified that he was allowed to lease or sublease some of Mr.

Irwin's property and received other benefits from him in return for the $21,632.33 advance paid by him. Although the testimony of Mr. Pilarski is not clear, the Court finds that Mr. Irwin was not indebted to Mr. and Mrs. Pilarski. Moreover, the record is devoid of any proof offered by the Credit Union that Mr. and Mrs. Pilarski were owed any money by Mr. Irwin. At trial, Mr. Pilarski indicated that he was not aware of any claims he had against either William Irwin or Irwin Farms, LLC. In turn, therefore, the assignment of the Pilarskis' claims against Mr. Irwin to the Credit Union is of no value.

Although entitled "Innocent Misrepresentation", Mr. Irwin's objection to the Credit Union's proof of claim is really based upon the theory that he already paid the Credit Union and that he is not indebted to it. The Court agrees. After tendering the check Mr. Irwin received from Mr. Pilarski to the Credit Union, the outstanding balance on the second loan for 2006 made by the Credit Union to Mr. Irwin was paid in full.

The Credit Union claims that Mr. Irwin's payment was a provisional payment and that he is still responsible for the amounts due on the note. See *In re Morweld Steel Products Corp.*, 8 B.R. 946 (Bankr. W.D. Mich. 1981). In this case, however, the Court disagrees with the Credit Union's analysis. Here, the monies were received by Mr. Irwin and clearly tendered to the Credit Union by him with the intent and expectation that those funds would be used to pay his obligation to the Credit Union in full. In this case, the Credit Union subsequently decided, for a variety of reasons, that litigation with Mr. and Mrs. Pilarski was unwise and that settlement was appropriate. The Credit Union's decision to resolve its differences with Mr. and Mrs. Pilarski is an independent decision separate of whatever claims it had against Mr. Irwin or that Mr. Irwin had against it. Moreover, the record lacks sufficient evidence to establish that Mr. Irwin or Irwin Farms, LLC owed any money to Mr. Pilarski. As such, any assignment theory propounded by the Credit Union must likewise fail.

The Court therefore concludes that when Mr. Irwin tendered the $21,632.33 to the Credit Union in May of 2007, his obligation was paid in full. To the extent that the Credit Union has filed a Proof of Claim for repayment of these monies, Mr. Irwin's objection to that claim is sustained.

C.  Exemplary Damages

Mr. Irwin also seeks exemplary damages for the intentional and malicious representations made by the Credit Union, which he alleges caused him humiliation, outrage, and indignation. After review of the record in this matter, the Court denies Mr. Irwin's request.

First, these damages are not recoverable as a matter of law. *Scarff Brothers, Inc. v. Bischer Farms, Inc.*, 546 F.Supp.2d 473, 487 (E.D. Mich. 2008). As in *Scharff Brothers*, the parties in this case were parties to a number of contracts. Accordingly, damages are limited to those damages that emanate from a breach of contract, as opposed to a tort.

Second, none of the actions, statements, or representations made by the Credit Union in this case rise to the level of a willful or wanton act that demonstrates a reckless disregard for Mr. Irwin's rights. Instead, the record in this case establishes that the Credit Union sought to recover payment of a loan that was seriously past due. Although Mr. Irwin may have hoped that the Credit Union would advance significant monies to him to allow him to continue his 2007 operations or even finance or partially finance his obligations to John Deere Credit, there is little in the record to support that optimistic expectation. Mr. Irwin cannot point to any writing directed to him by the Credit Union promising a loan, much less the terms and conditions of such a loan. In particular, there is nothing in this record to indicate that the Credit Union offered to loan a certain amount of money, an interest rate, repayment terms, or a description of the necessary security for such a loan. A close examination of this record indicates that the Credit Union merely took its normal and reasonable steps to work with a long term customer and to

procure payment of a delinquent loan. Regrettably for Mr. Irwin, once the Credit Union began its due diligence and a closer examination of his financial situation, the dramatic reduction in the value of Mr. Irwin's farm equipment coupled with his low credit status simply prohibited the Credit Union from making any substantial loans to him.[4]

Moreover, to the extent the Court concludes that the Credit Union did anything improper in this case, that conclusion is based upon the Credit Union's attempt to characterize the $21,632.33 payment made by the Credit Union to Mr. and Mrs. Pilarski as a disbursement on a loan that was closed as late as May of 2007. Although the Court is satisfied that its previous ruling regarding Mr. Irwin's objection to the Credit Union's Proof of Claim satisfactorily resolves this matter, the Court further holds that to the extent any outrageous action was taken by the Credit Union, that action is compensated for by the conclusion of the Court that the Credit Union shall not have a claim in this Chapter 12. Accordingly, Plaintiff's request for exemplary damages are denied.

---

[4] The Court considered deciding this case simply on Mich. Comp. Laws § 566.132(2), which requires actions such as those raised by Mr. Irwin in this proceeding to be based on a writing. It appeared to the Court that this analysis would not be case determinative, however, so the Court declines to engage in that analysis for the sake of brevity.

## Conclusion

As pled in Count II, Mr. Irwin's objection to the Credit Union's Proof of Claim is sustained. All other relief requested by Mr. Irwin is denied and the remaining Counts of his Complaint are dismissed.

**Signed on December 10, 2009**

                                    **/s/ Daniel S. Opperman**
                          **Daniel S. Opperman**
                          **United States Bankruptcy Judge**